**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Eric Hoerner,

        Plaintiff,                  Civ. No. 13-1411 (RHK/JJK)
                                               **MEMORANDUM OPINION
                                               AND ORDER**

v.

Robert Schei, *et al.*,

        Defendants.

Duane A. Kennedy, Kennedy Law Office, Rochester, Minnesota, for Plaintiff.

Jason M. Hiveley, Jon K. Iverson, Iverson Reuvers Condon, Bloomington, Minnesota, for Defendant Sylvia Quirk.

Gregory J. Griffiths, Jennifer Marie Peterson, Dunlap & Seeger, P.A., Rochester, Minnesota, for the remaining Defendants.

**INTRODUCTION**

      This case arises out of Plaintiff Eric Hoerner's arrest in Rochester, Minnesota, on August 1, 2010. Hoerner alleges that the arresting officer, Defendant Sylvia Quirk, lacked a basis to take him into custody and that several deputies at the Olmsted County Adult Detention Center ("ADC")[1], to which Quirk transported him, unlawfully strip searched him and used excessive force during the booking process. Presently before the Court are (1) Quirk's Motion for Summary Judgment and (2) the remaining Defendants'

---

[1] Defendants Robert Schei, Frank Ensor, Eric Williams, William Onago, Jeff Hackman, David Schilling, and Christian Spelhaug.

Motion for Summary Judgment. For the reasons that follow, the Court will grant both Motions.

**BACKGROUND**

The record reveals the following undisputed facts.[2] Shortly before 1:00 a.m. on August 1, 2010, Hoerner was standing in the roadway in front of his house, screaming for help. Rochester police were called, and Quirk was dispatched to the scene; she knew the address as one from which "multiple suspicious calls" had been received. En route to the location, she was advised that several neighbors had identified Hoerner as the person screaming and that he was a known "meth-head." Quirk, too, knew Hoerner as an "off-again/on-again" drug user.

Upon arrival, Quirk found Hoerner in the street, sweating profusely and yelling about a man in his closet and a shotgun in a vehicle down the roadway. The lights were on in his home and the front door was wide open. Hoerner was extremely animated and began walking toward Quirk while waving his arms around. Quirk ordered him onto his knees and he complied. She then handcuffed him, patted him down for weapons and

---

[2] Because the Court must view the record in the light most favorable to the non-movant at summary judgment, "this usually means adopting . . . the plaintiff's version of the facts." Scott v. Harris, 550 U.S. 372, 378 (2007). But this does not mean a plaintiff may eschew "mak[ing] reference to where a particular fact appears in the record," even when "there is little or no difference in the facts between the parties," as Hoerner claims here. (Mem. in Opp'n at 8.) Indeed, a plaintiff attempting to avoid summary judgment is obligated to "designate specific facts" – with record citations – to properly oppose the motion. Crossley v. Ga.-Pac. Corp., 355 F.3d 1112, 1113 (8th Cir. 2004) (per curiam); accord, e.g., Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 734-35 (8th Cir. 2009) (non-movant bears the "responsibility to show that there [are] genuine issues of material fact *in the record* that preclude[] summary judgment") (emphasis added); see also Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("[W]e will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."). Because Hoerner failed to do so, the Court recites the facts here as presented (and properly supported) by Defendants.

drugs (finding none), and placed him in the back of her squad car, noting in the process that he had a pink substance all around his lips and that he was not responsive to her questions.  Around this time, additional officers arrived and informed Quirk that Hoerner had an outstanding arrest warrant in connection with a shoplifting charge.  After confirming the warrant, Quirk informed Hoerner he was under arrest and transported him to the ADC.  Along the way, Hoerner continued hallucinating, mentioning (among other things) that people were in his house, others were in the squad car with him, and that people were trying to shoot him or kill him.  Quirk radioed the ADC that she was en route with a disorderly subject.

     Quirk arrived at the ADC at approximately 1:15 a.m.  When she pulled into the sally port,[3] Hoerner was screaming incoherently, complaining that a piece of tissue was trying to "get him" and jumping around in the backseat of the squad car.  Defendant Robert Schei, the detention sergeant on duty, was well aware of Hoerner's history of drug use, since he (Hoerner) had been arrested and booked into the ADC more than thirty times.  Schei called for assistance from other deputies, and the remaining Defendants arrived to help remove Hoerner.  Schei and Defendant Frank Ensor ordered Hoerner to exit and, when he failed to do so, pulled him from the car.  The deputies observed that Hoerner was sweating, had dilated pupils, and was combative, repeatedly ignoring commands to cooperate and physically resisting the deputies' efforts to control him.

---

[3] A sally port is a secure, controlled entryway into a jail.  See http://en.wikipedia.org/wiki/Sally_port (last visited September 18, 2014).

Nevertheless, they managed to bring him to the ADC's booking area, but Hoerner became even more combative and aggressive.

By the time Hoerner reached the booking area, Schei was concerned he might be overdosing on narcotics. Furthermore, ADC policy requires all inmates to be searched prior to entering the facility, in order to detect and prevent the introduction of contraband, including drugs. Given his state, Schei ordered Ensor and Defendants Eric Williams, William Onago, Jeff Hackman, and David Schilling to take him to the ground, in order to conduct a search in a "controlled" manner. Schei grabbed Hoerner's feet and pulled them from under him while the remaining deputies lifted Hoerner's upper body and, together, placed him face down on the floor. Hoerner screamed and fought the deputies throughout; no contraband was found.

Nevertheless, because of Hoerner's prior history of drug use, his agitated state, and the other physical signs indicating he was under the influence of narcotics, Schei concluded Hoerner should be strip-searched. ADC policy permits a strip search when reasonable cause exists to conclude a detainee could be concealing contraband. The policy further provides that reasonable cause may be based on, among other factors, the detainee's conduct, demeanor, criminal history, and other similar factors. Notably, Hoerner had been strip searched previously when booked into the ADC.

To conduct the strip search, the deputies carried Hoerner to a cell. By Hoerner's own reckoning, his mental state worsened and his "delirium increased" when the deputies brought him to the cell; he kicked and thrashed as he was being carried, and he attempted to grab the pepper spray Onago carried on his duty belt. The deputies struggled to

control him and had difficulty removing his clothes.  They held him against the ground while Schei removed his Taser and ordered Hoerner to stop resisting and accede to the search.  Hoerner continued to thrash about and scream, resulting in Schei deploying his Taser "four to five times" over the ensuing 10 minutes.  The deputies eventually managed to cut off Hoerner's clothing and complete the strip search; Hoerner resisted throughout.  The search revealed no drugs or weapons.

Following the search, Schei became increasingly concerned about Hoerner's deteriorating psychological status and the possibility he might have overdosed on drugs.  Accordingly, he left the cell and asked Quirk, who had remained at the ADC during the booking process, to call an ambulance.  In his absence, Defendant Christian Spelhaug, a detention corporal, Tasered Hoerner one additional time in an attempt to gain his compliance, to no avail.  Eventually, the deputies were able to place underwear on Hoerner and shackle his feet so he could no longer kick at them.  An ambulance later arrived and transported him to the hospital.

Hoerner commenced this action on June 13, 2013, alleging that Defendants' conduct violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  With discovery complete, Defendants now move for summary judgment.  The Motions have been fully briefed, the Court heard oral argument on September 10, 2014, and the Motions are now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

Hoerner's Complaint alleges that Defendants violated the Fourth and Fourteenth Amendments to the United States Constitution, but the precise contours of his claims are unclear.  The crux of his claims appears to be that Quirk and the detention deputies should have obtained immediate medical assistance for him due to his "obvious . . . psychotic breakdown," rather than place him in jail. (Mem. in Opp'n at 9; accord, e.g., id. at 9-10 ("[I]t is obvious Quirk was hauling a person in serious medical need away from the Hospital toward the other Defendants."); id. at 11 ("[N]o reasonable jailor would place Hoerner in jail, or even . . . allow[] [Hoerner] to walk around a booking area.

His medical needs were too great!").)[4]  To be sure, a police officer may violate the Constitution by failing to obtain medical care for an arrestee suffering from an objectively serious medical need, a so-called "deliberate indifference" claim.  See, e.g., Thompson v. King, 730 F.3d 742, 747 (8th Cir. 2013); Thomsen v. Ross, 368 F. Supp. 2d 961, 972-73 (D. Minn. 2005) (Rosenbaum, J.).  But such a claim falters here for several reasons.

First, Hoerner's Complaint refers to the Fourth and Fourteenth Amendments and his right to be "free from unreasonable seizures and searches." (Compl. ¶¶ 50, 51.)  It makes no reference to a delay in receiving medical care.  Moreover, deliberate-indifference claims typically arise under the *Eighth* Amendment, as made applicable to state actors through the Fourteenth Amendment.  See, e.g., Thomsen, 368 F. Supp. 2d at 972-73.  But the Complaint does not invoke the Eighth Amendment.  And while an arrestee may bring a deliberate-indifference claim under the *Fourteenth* Amendment's due-process clause, see, e.g., Hartsfield v. Colburn, 371 F.3d 454, 456-57 (8th Cir. 2004), due process is nowhere mentioned in the Complaint, either.  The upshot, therefore, is that Hoerner appears to now be asserting a claim he has nowhere pleaded.

Second, and more importantly, Hoerner overlooks that he ultimately received medical attention once the booking process was completed; his claim is predicated only

---

[4] It is not at all clear Hoerner was suffering from an "obvious psychotic breakdown," as opposed to simply being under the influence of drugs.  Indeed, he testified in his deposition that he could not remember if he had used methamphetamine on the night in question and that drug use may have caused his conduct that evening.  Moreover, while Hoerner contended at oral argument that all Defendants were aware he was mentally ill, he has pointed to no evidence to support that contention.

on his *delay* in receiving care, not the denial of care altogether. To prevail on a claim that delayed medical care violated the Constitution, an arrestee must show that "the deprivation [of care] was objectively serious." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005). But "the objective seriousness of the deprivation should . . . be measured by reference to the effect of [the] delay," and to establish this effect, the arrestee "*must place verifying medical evidence in the record* to establish the detrimental effect of [the] delay." Id. (emphasis added) (internal quotation marks and citation omitted). Here, Hoerner has not even *alleged* the delay in receiving care caused some detrimental effect, let alone offered any "verifying medical evidence" to substantiate it. At bottom, he simply cannot sustain a claim regarding Defendants' alleged failure to obtain immediate medical care for him.

As for the claims Hoerner has actually pleaded, they fare no better. He alleges he was unlawfully searched and seized in violation of the Fourth Amendment, but these claims cannot survive Defendants' Motions.[5]

Quirk. With regard to Quirk, Hoerner appears to contend that his initial seizure was unlawful because she had no reason to suspect he had committed a crime. (Mem. in

---

[5] Though Hoerner cites both the Fourth and Fourteenth Amendments, these two claims are really one and the same, as the Fourth Amendment applies to state actors via the Fourteenth Amendment. See Wolf v. Colorado, 338 U.S. 25, 27-28 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961); see also, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (noting that when "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process [under the Fourteenth Amendment], must be the guide for analyzing these claims"); Graham v. Connor, 490 U.S. 386, 388 (1989) ("[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a [Fourteenth Amendment] substantive due process standard.").

Opp'n at 9 ("Quirk needed probable cause, 'a reasonable ground for belief,' of criminal behavior, and she had none.").)  But law-enforcement officers may seize individuals posing a danger to themselves or the community, even in the absence of probable cause, under the well-recognized "community caretaker" function.  See, e.g., Cady v. Dombrowski, 413 U.S. 433, 441 (1973) ("Local police officers . . . frequently . . . engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."); Meehan v. Thompson, __ F.3d __, 2014 WL 3953992, at *4 (8th Cir. 2014) ("We have recognized that it may be reasonable under the Fourth Amendment for a police officer, acting in his capacity as community caretaker, to seize an apparently intoxicated individual to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.") (internal quotation marks and citations omitted).  Detention under the community-caretaker function is permissible if the governmental interest in the detention "outweighs the individual's interest in being free from arbitrary government interference."  United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014).

Here, Quirk encountered Hoerner standing in the middle of the road in front of his house, his front door wide open, at one o'clock in the morning while he was screaming and sweating profusely.  He was waving his arms and acting extremely agitated.  Quirk had been dispatched to the location several times before and knew Hoerner was a drug user.  Under these circumstances, she reasonably concluded Hoerner might be under the influence of drugs and appropriately detained him for his own safety.  See, e.g., Meehan,

2014 WL 3953992, at *5 (officer justified under community-caretaker function to detain moderately intoxicated individual standing alone in public road in the middle of the night); Winters v. Adams, 254 F.3d 758, 763-64 (8th Cir. 2001).  Moreover, this detention was brief, as a short time later Quirk was informed Hoerner had an outstanding warrant, which provided probable cause for his arrest.  Given these facts, Hoerner cannot establish a constitutional violation based on Quirk's initial detention and subsequent arrest of him.[6]

Hoerner appears to argue the community-caretaker function cannot apply because Quirk never intended to seek medical help for him. (Mem. in Opp'n at 10.)  But the exercise of an officer's caretaking discretion is not so circumscribed and does not turn on whether the officer intended to obtain medical help. See, e.g. Winters, 254 F.3d at 760-61 (detention of intoxicated individual justified under community-caretaker function despite no intent to take individual for medical care).  Hoerner cites no authority for the proposition that a caretaker detention is justified only when an officer intends to obtain immediate medical care for the detainee, and the Court is aware of none.

The detention deputies.  Hoerner takes a kitchen-sink approach with respect to his claims against the detention deputies.  He argues:

> [W]hy [did the deputies] drag him out of the squad car, why [did] . . . [they] force him face down on a cement floor to do a . . . search, . . . why carry him into the . . . strip search room, why [was] he tased multiple times, why [we]re his clothes cut off so that they [could] peer under his testicles and at

---

[6] Nor does the Court perceive any constitutional violation based upon Quirk's search of Hoerner when she initially detained him. See Meehan, 2014 WL 3953992, at *8 (reversing district court's determination that frisking individual detained under community-caretaker function violated Fourth Amendment).

>his anal opening[?]  It was all unreasonable.  Their behavior to Hoerner violated reason, policy and law.

(Mem. in Opp'n at 11.)  Putting aside that Hoerner offers no cogent explanation *what* "law," or *how* such law, was violated here, the "why" for each of these items is easily understood.  It is *undisputed* the detention deputies "dragged" Hoerner from the squad car because he would not comply with their commands to exit.  It is *undisputed* they held him down to perform a search – a search performed on all incoming detainees at the ADC – because he was thrashing and fighting their attempts to corral him.  It is *undisputed* they Tasered him several times and cut off his clothing because he was combative and repeatedly ignored commands to comply with their directives.[7]  Contrary to Hoerner's assertions, the deputies had legitimate reasons for their actions.  See Santiago v. Blair, 707 F.3d 984, 990 (8th Cir. 2013) (in analyzing claim regarding force used against detainee, "the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, [as opposed to] maliciously and sadistically to cause harm") (internal quotation marks and citations omitted).

The closest Hoerner comes to a valid constitutional claim against the detention deputies concerns the strip search, but ultimately this claim, too, falls short.  Hoerner asserts the deputies strip-searched him without probable cause and in violation of ADC policy.  But the Supreme Court recently recognized that jails may strip search incoming inmates, even those accused of petty offenses, *without any reasonably articulable*

---

[7] Without citation to the record, Hoerner claims he was "not a very disorderly subject nor was he assaultive."  (Mem. in Opp'n at 12 (internal quotation marks omitted).)  But this bald assertion flies in the face of all the *undisputed* evidence that Hoerner was combative from the moment he arrived at the ADC.

*suspicion of contraband*, in the interests of inmate and jailer safety.  <u>Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington</u>, __ U.S. __, 132 S. Ct. 1510, 1520-23 (2012).[8]  Nor does the fact the detention deputies (assertedly) violated ADC policy alter the analysis.  <u>See, e.g.</u>, <u>Gardner v. Howard</u>, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy."); <u>Wyatt v. Slagle</u>, 240 F. Supp. 2d 931, 938 (S.D. Iowa 2002) ("[P]olice department procedures do not set the standard by which Fourth Amendment reasonableness is judged.").

Hoerner also appears to contend the deputies' repeated deployment of a Taser amounted to excessive force.  (Mem. in Opp'n at 11.)  But the detention deputies assert they are entitled to qualified immunity on such a claim, and the Court agrees.  As the undersigned has previously noted, a Taser inflicts nothing more than a *de minimis* injury, <u>see, e.g.</u>, <u>Robinson v. City of Minneapolis</u>, 957 F. Supp. 2d 1094, 1100 (D. Minn. 2013) (Kyle, J.) (citing <u>LaCross v. City of Duluth</u>, 713 F.3d 1155, 1158 (8th Cir. 2013)), and in the absence of evidence of long-term injury resulting from the Taser, which Hoerner has nowhere even alleged, he cannot overcome qualified immunity on such a claim.  <u>See</u> <u>id.</u> (because it was not clearly established prior to June 6, 2011, that a police officer

---

[8] At the time of Hoerner's arrest, the Eighth Circuit required reasonable suspicion that a non-violent misdemeanant possessed contraband before a strip search was permissible.  <u>See, e.g.</u>, <u>Jones v. Edwards</u>, 770 F.2d 739, 741-42 (8th Cir. 1985).  But the law in 2010 is irrelevant now; the question is whether Hoerner asserts a valid constitutional claim "under the law *as currently interpreted*."  <u>Engleman v. Deputy Murray</u>, 546 F.3d 944, 947 (8th Cir. 2008) (emphasis added) (citation omitted).  <u>Florence</u> makes clear that the law, as it now stands, permits a strip search on any new admittee to a jail facility.  Regardless, based on Hoerner's hallucinations, his profuse sweating and dilated pupils, his combative nature, and his history of drug use, in the Court's view the detention deputies had reasonable suspicion to believe Hoerner might have drugs hidden on his person.

inflicting *de minimis* injury could be constitutionally liable, officer deploying Taser on arrestee was entitled to qualified immunity).

## CONCLUSION

All told, the record fails to establish a triable issue on any of Hoerner's vague and amorphous claims – whether pleaded or unpleaded. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that (1) Quirk's Motion for Summary Judgment (Doc. No. 19) and (2) the remaining Defendants' Motion for Summary Judgment (Doc. No. 34) are **GRANTED** and Hoerner's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: September 18, 2014                     s/Richard H. Kyle
                                             RICHARD H. KYLE
                                             United States District Judge